**F. Sutherland MACKLEM, Plaintiff,**

v.

**Edwin L. REYNOLDS, Acting Commissioner of Patents, Defendant.**

**Civ. A. No. 2722–63.**

United States District Court
District of Columbia.

July 2, 1965.

James E. Cockfield, Burns, Doane, Benedict, Swecker & Mathis, Washington, D. C., John M. Calimafde, Paul H. Blaustein, Hopgood & Calimafde, New York City, for plaintiff.

Clarence W. Moore, Sol., Washington, D. C., for defendant.

JACKSON, District Judge.

This action came on for trial on February 25, 1965. Upon due consideration of the evidence presented, together with the briefs counsel were accorded an opportunity to file, the Court has found in favor of the plaintiff, and will authorize the Commissioner of Patents to grant plaintiff a patent containing claims 1 and 3 of his application Serial No. 585,-717.

Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court states its Findings of Fact and Conclusions of Law separately as follows:

1. This is an action under 35 U.S.C. § 145 in which plaintiff now seeks an order from the Court authorizing defendant to issue a patent to him containing claims 1 and 3 of his application for patent Serial No. 585,717, filed May 18, 1956, for "Printing Device." At trial, plaintiff withdrew claims 2 and 18. The remaining claims in the application were held by the Examiner to be for a non-elected invention, and are not before the Court.

2. Claims 1 and 3 pertain to xerographic photocopying, particularly contact exposure from the rear or through the backing for the photoconductive material. Claim 1 reads as follows:

1. The photo-reproduction method employing a sheet of translucent paper having a photoconductive insulative coating on one side thereof that is photoelectrically-responsive when subjected to an electrical charge, which comprises

positioning a positive translucent master on the uncoated side of said sheet,

impressing an electrical potential across said sheet,

directing illumination through said master sheet to the photoconductive side thereof, thereby producing an electrical charge pattern corresponding to the copy on said master,

and developing said coating while held in contact with said master by applying solid developer particles to said photoconductive side,

the particles adhering to the side in accordance with said charge pattern.

Claim 3 is similar, with the addition of a heating step to fix the developed copy image while the master remains in contact with the "paper" copy sheet.

3. The Examiner and Board of Appeals relied upon three United States patents and a published article as prior art, as follows:

| | | |
|---|---|---|
| Gundlach | 2,885,556 | May 5, 1959 (Filed March 7, 1955) |
| Mayer | 2,892,709 | June 30, 1959 (Filed August 1, 1955) |
| Straughan | 2,892,973 | June 30, 1959 (Filed Jan. 26, 1955) |
| Young et al. | R.C.A. Review | Dec. 1954, (pp. 469–484) |

In addition to those references, defendant has introduced into evidence the following United States patents:

| | | |
|---|---|---|
| Steinhilper | 2,955,938 | Oct. 11, 1960 (Filed Aug. 1, 1955) |
| Grieg | 2,963,365 | Dec. 6, 1960 (Filed Feb. 16, 1956) |

4. The invention at issue is directed to a method for copying from a translucent master sheet having printing only on one of its surfaces. The invention has particular utility for example, in copying engineering drawings which normally are made on vellum paper.

The invention requires the use of photoconductive copying paper, i. e., ordinary paper as a carrier having a layer or coating of photoconductive material on one of its surfaces. The photoconduc-

tive material is made light-sensitive by electrostatically charging it.

The process is commenced by mounting the original (or master) so that the printed side is face down on the uncoated surface of the photocopy paper. The photoconductive surface is free of the original. The original and photocopy paper are thus mounted in direct contacting relationship and fed into the machine as a "set". The two pieces of paper are passed through a charging chamber where the charge is applied across the set. Most importantly, however, the charge is imposed across the photoconductive layer to make it light-sensitive. The set is then transported to a transparent drum. A light source and reflector are located within the drum and the light is directed through the drum into the region where the original and photocopy set pass. The set of papers as originally oriented, i. e., original with printing face down and photocopy with photoconductive layer face down and free of the original, are subjected to the light which · passes through the transparent drum. The printing on the original blocks the transmission of light to the photocopy paper. The light will, therefore, impinge on the photoconductive layer where printing does not exist on the original. The effect of the light is to dissipate the charge on the photoconductive layer. The photoconductive layer, therefore, is left with a charge pattern corresponding to the printing on the original. Since the original is mounted with the printing face down and the photoconductive layer is also face down, the charge pattern is a direct image of the printed matter; that is, it is not a mirror image.

The set of papers are directed in their travel by rotation of the drum and are next brought into the developing area. In the developing area, developer powder such as black graphite powder is dusted on the photoconductive surface while the original and photocopy are still mounted together as a set. The developer powder is dusted on to the free side of the photocopy paper and the powder adheres to the charged pattern. The outline formed by the powder corresponds exactly to the printed matter on the original.

The set of papers are then transported by the drum to a fixing station where the developer powder is fused together with and bonded to the paper by the application of heat. The copy is thereby completed and both the original and photocopy paper set are moved out of the machine for separation.

Claim 1 defines the above described process with the exception of the fixing step. Claim 3 adds the fixing step as a limitation.

The invention is characterized by mounting the original and the photocopy paper in direct contact, and maintaining the two pieces of paper together during the operational processes while work is being performed on the free photoconductive surface. The invention is additionally characterized by the realization that it is not necessary to separate the original and photocopy paper before charging the photocopy paper. Although Claim 1 does not expressly state that the electrical charge is impressed across both pieces of paper, the Claim does recite that the original (or master) is positioned on the uncoated side of the photocopy paper before the application of the electrical charge. By charging both pieces of paper as a set, comparative simplicity has been achieved.

5. The rejection by the Patent Office was based primarily on the patent to Mayer taken alone, or in combination with the patent to Gundlach. The patent to Straughan was also cited to show that the Mayer process, which is limited to the copying of a positive from a negative, may be modified in accordance with the Straughan patent so that the copying is from positive to positive. The Electrofax article was cited to show that xerographic processes were known prior to applicant's invention.

6. The patent to Mayer was considered by the Examiner and the Board to be the most pertinent. The patent shows a transferral process in which the charged image is developed on the surface of

a drum in "mirror" form, and then copy paper is brought into direct contact with the mirror image on the drum. The drum, therefore, acts as a printing machine and prints its image on the copy paper as a printing press prints on newspaper. More specifically, Mayer discloses a specially laminated drum structure. The outer layer of the drum is a photoconductive cylinder; inside that is a transparent cylindrical metal electrode, which is connected to one terminal of the battery 30; inside the electrode is a cylinder made of transparent glass. Mounted on the inside surface of the glass cylinder is a photographic negative. Finally, a light source is positioned in the center.

Mayer provides a liquid developer located in a reservoir. The developer is carried into contact with the drum by means of a conductive roller. Where the light impinges on the photoconductive cylinder, it creates a pattern corresponding to the pattern on the negative. This pattern is electrical, and portions of it attract the developer from the surface of the roller.

By this method, Mayer produces a developed image on the surface of his drum. The image is transferred from the drum by bringing paper into contact with the drum by the roller. The paper in Mayer is not a photoconductive paper, but is ordinary paper on which the image is printed. Since the printing is a result of the drum impressing its image on the paper, the image on the drum is in "mirror" form, and upon transfer is reversed into a direct readable form.

7. Mayer does not disclose the essential and critical features of the Macklem invention, namely, Mayer does not disclose a system which provides for direct printing from a paper original directly on to a photocopy paper. He does not suggest the concept of mounting paper on paper and feeding the two sheets of paper as a set through the machine with the photoconductive layer of the photocopy being free for work to be performed on it. The concept of charging both pieces of paper is also absent from the Mayer disclosure. The Mayer invention involves a complicated drum structure consisting of a plurality of cylinders with an interposed metallic electrode. The purpose of the laminated drum construction is to produce a developed image in mirror form on the surface of the drum, and then to utilize the drum as a printing device for printing the developed image onto the paper. The teaching of the patent would not suggest plaintiff's subject matter to persons ordinarily skilled in the art.

8. The first subordinate reference cited by the Patent Office is the patent to Gundlach. This patent discloses a system for projecting an image from a master through an optical system on to photoconductive paper. Although the patent discloses a photocopy process which utilizes photocopy paper of the type involved in the Macklem invention, the modus operandi is totally different from the Macklem invention. In the Gundlach patent, there is no suggestion of direct printing through an original which is mounted directly on the photocopy paper; Gundlach, in fact, requires a complex and costly optical projection system. Further, Gundlach does not disclose the feature of mounting the original and photocopy in face to face relationship with the photoconductive layer free for work to be performed on it during the travel of both pieces of paper as a "set" through the machine.

9. The patent to Straughan discloses a drum which is substantially the same as the Mayer drum, but is directed to a novel way of applying a charge to the photoconductive layer. In the Mayer patent, the charge across the photoconductive layer is applied by the cylindrical electrode and by the contacting surface of the roller. In the Mayer patent, the photoconductive layer is not pre-charged. In the Straughan patent, the photoconductive cylinder is pre-charged by a wand and, because the photoconductive cylinder is pre-charged, the Straughan process can produce a positive copy from a positive. This patent, however, is no more pertinent than the Mayer refer-

ence, because it does not disclose direct printing by mounting two pieces of paper in face to face relationship with the photoconductive layer free for work to be performed on it while the two pieces of paper travel through the machine together.

10. The Examiner cited the article entitled "Electrofax" to show that the xerographic process generally was known. The article discloses a process of projecting an image from an original onto photocopy paper with the photoconductive layer facing upwardly in contact with the original. The article does not disclose a continuous process where the steps of charging, exposing, developing and fixing are performed continuously during a cycle of machine operation. There is no suggestion of mounting two sheets of paper in the manner claimed in the plaintiff's invention; nor is there any suggestion of charging the two pieces of paper while they are in face to face relation. The Electrofax article in fact points in the opposite direction. The article teaches the charging of the photocopy paper separately because charging of both pieces of paper produces a cohesive effect between the paper sheets. Since, in the Electrofax article, after exposure, the sheets are separated and the photocopy sheet separately developed, it is important that the cohesive effect be reduced to the minimum level. In Macklem's invention, the cohesive effect is desirable because the two sheets of paper travel through the machine together as a "set".

The patent to Steinhilper, added at trial, discloses a transfer process which utilizes a drum on which the image is developed before being transferred from the drum to ordinary copy paper. Steinhilper's drum employs a transparent inner cylinder and a photoconductive outer cylinder which, through complicated processes of electrostatic charging, is charged only across the photoconductive cylinder. The sheet to be copied is projected through a complex optical system on to the surface of the drum. After the image is developed by the application of powder, the drum, as in Mayer's process, serves as a printing device which prints the image on to a piece of copy paper. This patent does not disclose mounting the original in direct contact with the photocopy paper, and does not disclose the concept of mounting the photocopy paper with the photoconductive surface free of the original so that work may be performed on the surface while the two pieces of paper are traveling through the machine.

11. The second patent added at trial is the patent to Greig, which is directed to photocopy paper having photoconductive layers on both surfaces for simultaneous exposing and developing. This patent discloses a process wherein the original (or master) is initially placed on one of the photoconductive layers, exposed, and then removed before the processing operation. The image of the master is projected onto the photoconductive surfaces by projectors. The Greig patent does not suggest the basic concept of bringing the original and photocopy pieces of paper together and, while together, performing all the necessary operations to produce the copy.

12. The references cited by the defendant may be divided into two categories. The first category consists of those patents which disclose a transferral process. In those patents, a complicated drum having a photoconductive cylinder is employed. The drum as used in the transferral processes serves the same purpose as the ordinary printing press, in that a developed image is formed on the drum and the drum transfers the image onto ordinary paper. The second category of prior art relied upon by the defendant consists of the patents to Gundlach and Greig and the article entitled "Electrofax". This prior art demonstrates that one skilled in the art would have charged the photocopy paper separately before bringing it into contact with the original; further, they demonstrate that it would have been obvious to separate the photocopy paper from the original after exposure and then to process the photocopy paper sepa-

rately. This prior art points away from the Macklem concept of charging the pieces of paper together and processing the photocopy while it is in direct contact with the original as both pieces of paper travel together as a "set" through the machine.

13. The distinctions between Macklem's invention as defined in the claims and the prior art would not have been obvious to one skilled in the art to which the invention pertains at the time the Macklem invention was made.

14. The invention as defined by the claims yields advantages not found in the prior art.

15. The invention as defined by the claims is practical, marketable and is significantly more simple than the prior art processes.

### CONCLUSIONS OF LAW

1. Claims 1 and 3 are patentable in view of the prior art because they define an invention which would not have been obvious to one having ordinary skill in the art to which the invention pertains at the time the invention was made.

2. The plaintiff is entitled to receive a patent containing claims 1 and 3 of his application Serial No. 585,717.